IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-05-484 |
| | § | CIVIL ACTION NO. H-08-3426 |
| DALE ERIC BECKHAM, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Dale Eric Beckham's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 97),[1] the United States' Answer, and Motion to Dismiss Based on Waiver (Document No. 109). After reviewing Movant's § 2255 Motion, the Government's Answer and Motion to Dismiss, the record of the proceedings before the District Court in the underlying criminal case, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion to Dismiss Based on Waiver (Document No. 109) be GRANTED, that Movant's Motion to Vacate, Set Aside, or Correct Sentence (Document No. 97) be DENIED, and that this § 2255 proceeding be DISMISSED.

---

[1] Dale Eric Beckham's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-08-3426 and at Document No. 97 in Criminal Action No. H-05-484. References hereafter will be to the Criminal Document numbers unless otherwise indicated.

I.      **Procedural History**

Movant Dale Eric Beckham ("Beckham"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255.  This is Beckham's first attempt at § 2255 relief.

On December 21, 2005, Beckham was charged by Indictment with transportation of child pornography in violation of 18 U.S.C. §§ 2252A(a)(1) and 2252A(b)(1) (Count one), and possession of child pornography involving the sexual exploitation of minors in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2) and 2256(8)(A-C) (Count two).  (Document No. 1).  On July 7, 2006, pursuant to a written Plea Agreement pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B), Beckham pleaded guilty to Count one.  (Document No. 48, Document No. 49, ¶ 1, Document No. 105, Transcript of Rearraignment Hearing).  Under the written Plea Agreement, Beckham agreed to waive his right to appeal and collaterally attack his conviction. (Document No. 49, ¶¶ 7, 8, 9).  The Government agreed to: (1) dismiss the remaining count of the Indictment, (2) not oppose Beckham receiving a two level downward adjustment for acceptance of responsibility and (3) should Beckham qualify for an adjustment under U.S.S.G. § 3E1.1(a), and his offense level was 16 or greater, move for an additional one level departure based on the timeliness of the Agreement or the manner in which Beckham provided information about his role in the offense, (4) not to seek a sentence outside the middle range of the guideline or an upward adjustment  and (5) not to file additional child pornography or child exploitation charges for conduct that was part of the facts surrounding Beckham's arrest and prosecution in the Southern District of Texas. (Document No. 49, ¶ 10).  With respect to the waiver of appeal rights, including the right to bring a § 2255 motion, and the calculation of Beckham sentence, the written Plea Agreement provided in pertinent part:

7.  Defendant is aware that Title 18, U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.  The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined on any grounds set forth in Title 18 U.S.C. § 3742.  Additionally, the defendant is aware that Title 28, U.S.C. § 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final.  The defendant waives the right to contest his conviction or sentence by means of any post-conviction proceeding, including but not limited to Title 28, U.S.C. § 2255.

                  *                  *

8.  In agreeing to these waivers, defendant is aware that a sentence has not yet been determined by the Court.  The defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction, not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office or the Court.  The United States does not make any promise or representation concerning what sentence the defendant will receive.  Defendant further understands and agrees that the <u>United States Sentencing Guidelines</u> are "effectively advisory" to the Court.  *United States v. Booker*, 125 S.Ct. 738 (2005).  Accordingly, defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing defendant, the Court is not bound to follow the Sentencing Guidelines or sentence the defendant within the calculated guideline range.

9.  The defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this agreement.

In addition, Beckham and his attorney, Steven J. Rozan, executed addendums to the written Plea

Agreement, which state in pertinent part:

I have fully explained to defendant his rights with respect to the pending indictment.  I have fully reviewed the provisions of the United States Sentencing Commission's *Guidelines Manual* and *Policy Statements* and I have fully and carefully explained to defendant the provisions of those Guidelines which may apply in this case.  I have also explained to defendant that the Sentencing Guidelines are only advisory and the court may sentence defendant up to the maximum allowed by statue per count of conviction.  Further, I have carefully reviewed every part of this plea agreement with defendant.  To my knowledge, defendant's decision to enter into this agreement is an informed and voluntary one.  (Document No. 49, p. 14).

Likewise, Beckham stated:

> I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me. My attorney has fully explained and I understand all my rights with respect to the provisions of the United States Sentencing Commission's *Guidelines Manual* which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms. (Document No. 49, p. 15).

At Beckham's July 7, 2006, Rearraignment, the Court engaged in an extended colloquy with Beckham to ensure that he had read the written Plea Agreement and had conferred with his attorney about the contents of the Plea Agreement. The Court also advised Beckham of the consequences of his plea, including the maximum sentence he faced, the manner in which his sentence would be calculated, the factual basis of the plea, and the waiver provisions:

> The Court: How old are you?
>
> The Defendant: Thirty-three.
>
> The Court: What is your educational background?
>
> The Defendant: High school through – and some college.
>
>          *                *
>
> The Court: Have you been treated recently for any mental illness or addiction to narcotic drugs of any kind?
>
> The Defendant: No.
>
> The Court: Are you currently under the influence of any drug or medication or alcoholic beverage of any kind?
>
> The Defendant: No, your Honor.
>
>          *                *
>
> The Court: And have you discussed those written charges and the case in general with your attorney?

4

The Defendant:  Yes, your Honor.

The Court:  Do you feel that you understand what it is you are being charged with?

The Defendant:  Yes, your Honor.

The Court:  All right.  Are you fully satisfied with the counsel, representation, and advice given to you in this case by Mr. Rozan as your attorney.

The Defendant:  Yes, your Honor.

                              *                                        *

Ms. Minnis:  Your Honor, the defendant has agreed to plead guilty to Count 1 of the indictment, which is transportation of child pornography.  And if he persists in that plea through sentencing, we agree to dismiss the remaining count, which is possession of child pornography.

In addition to that, we agree not to oppose him being given two levels off for acceptance.  Should the Court find that he qualifies after the receipt of the probation officer's report, in addition to that, we would agree, then, at that juncture for the third level to be awarded him.

We also agree that we won't seek a sentence of imprisonment only outside the middle range of the guideline range nor will we seek an upward departure from the guideline range; but we do reserve the right to argue what is the appropriate imprisonment guideline range.

In addition to that, we agree not to file additional child pornography or exploitation charges for the conduct that surrounds the facts of his arrest.  And those include online enticement of a minor, travel in interstate and foreign commerce for illicit sex; and in addition to that, a type of production under 18 USC 2251A(b)(1) or (2), which involves production of images of a child that he's obtained control of.

The Court:  All right.  And anything about the appeal?

Ms. Minnis:  He waives his appeal, yes, your Honor.  I'm sorry.  I skipped right over one of the most important things.

The Court:  All right.

Ms. Minnis:  And post conviction collateral attacks.

5

The Court:  All right.  Mr. Beckham, does Ms. Minnis' summary sound like a fair and accurate summary of the written plea agreement that you propose to enter into this afternoon?

The Defendant:  Yes, your Honor.

The Court:  Have you read over the plea agreement?

The Defendant:  Yes, your Honor.

The Court:  And have you discussed it with your attorney Mr. Rozan?

The Court:  Do you feel that you understand what it is you're agreeing to in that written plea agreement?

The Defendant:  Yes, your Honor.

                     *                          *

The Court:  I [ ] want to go over with you now the maximum possible penalties you're facing as a result of your plea of guilty this afternoon.

You are pleading guilty to Count 1, which charges you with transportation of child pornography, a violation of 18, United States Code, Section 2252A(a)(1).

The penalty for that crime is a term of imprisonment of no less than five years nor more than 20 years; a fine not greater than $250,000 and any term of years or life supervised release.

                     *                          *

The Court:  All right.  Under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow.  Have you and Mr. Rozan discussed how those guidelines might apply in your case?

The Defendant:  Yes, your Honor.

The Court:  All right.  Do you understand and have you - all talked about the fact that those guidelines are no longer mandatory but they are advisory at this point?

The Defendant:  Yes, your Honor.

The Court:  Nevertheless, I am required to consider the guidelines before I determine what your sentence will be.  Do you understand that?

The Defendant:  Yes, your Honor.

The Court:  And, so, for that reason, I can't tell you this afternoon what your sentence will be.  You understand?

The Defendant:  Yes, your Honor.

                    *                                        *

The Court:  But do you also understand that by the terms of the written plea agreement that you propose to enter into this afternoon you will be waiving, or giving up, virtually all of the rights that you would have to appeal any sentence I impose?

The Defendant:  Yes, your Honor.

The Court:  All right.  And that includes any collateral attack after – such as a habeas corpus or matters of that kind.  Do you understand?

The Defendant:  Yes, your Honor.

                    *                                        *

The Court:  All right.  Ms. Minnis, tell me what it is the Government is prepared to prove if we went to trial in this case.

Ms. Minnis:  Your Honor, the Government would prove, as the factual basis states on Page 7, 8, 9, and 10 and part of 11, that the defendant traveled to Ottawa, Canada, from his home in TheWoodlands, Texas, on or about March 5, of 2005 and at that time he checked into the Novatel Hotel in Ottawa, Canada, having traveled via airline from the Houston area to Dallas and then ultimately to Ottawa.

We would be able to prove the events that have unfolded, that are lined out in the Paragraphs 14a through k, or something like that, that on March 6th that he came to the attention of Canadian authorities in Ottawa because the parents of a 14 year old boy had determined that their boy had met someone at the Novatel Hotel.  And, essentially, they at that time didn't know whether he had been abducted by someone or not.

So, on March the 5th they received a request from their son to go to essentially a mall in Ottawa.  And he made that request after he'd received a phone call.  The parents

later allowed him to go; but they later checked the caller ID function of the phone, found out that the call, which was a long distance call, had, in fact, come from Houston, Texas.

They also at the time — while the child was away, they went and checked his computer and found that the last chat log was a dialogue with someone in Texas. The father called the long distance number from which the call had been made earlier, on March 5th; and he retrieved – or he found that the voice mail said that the name Dale – the person was  named Dale and that the area code was a Houston, Texas, area code.

When the 14 year old boy came home that evening, the parents didn't disclose what they had learned.  But on March 6th, while the mother was cleaning her son's bedroom, she found a paper that contained the long distance number that had been involved in that same call from the previous day.  There was also a local number and other numbers that the mother thought might be room numbers. The parents called the local number and found out that it was, the Novatel Hotel in Ottawa, Canada.

Also, on March 6, 2005, after the mother discovered that information, the boy asked if he could go to a movie with a friend that the parents didn't know.  The parents thought this was suspicious, but they went ahead and let him go.  They dropped him off at the movie theater.  They remained in the area to see if their son was meeting anyone.

They said to the police in Canada that they saw him, their son, get in a taxi that they thought might have had a passenger in the back seat; but the mother and father didn't completely see the person, if there was one, in the car.

At this point the parents had called 911.  The police got involved and determined from the taxicab company that it wasn't the taxicab that the parents had seen but it was one of the same company.  They later found out that a fare had been dropped off at the Novatel Hotel in the same period of time in which the parents were speaking with the police.

The police went to the Novatel Hotel, spoke with an employee who said that they had seen a teenager arrive in the room minutes before the police arrived on March 6 of '05.  Officers found the room that had been identified by the employee.  They went to it and knocked on the door after they heard sounds inside the room consistent with some type of sexual activity, in their minds.

Mr. Beckham answered the door and officers asked him where the minor was located. They noticed that there was something under the covers of the bed, went in the room, still thinking that the child had been abducted in some fashion, pulled back the covers,

8

and they found the 14 year old boy, unclothed in bed. Later, the 14 year old boy admitted that he and Mr. Beckham had had sexual intercourse the day before, on March 5th, but had only done some touching that day before the police arrived. The age of consent of this type of activity in Canada is 14.

The 14 year old boy also admitted to officers that Mr. Beckham had taken pictures of him in the hotel room, some of which were unclothed and were pictures of his nude genitals. Those production charges were abandoned in Canada.

Officers, upon [ ] doing a protective sweep in the room after finding the child, found an Apple box – laptop computer, a digital camera, a memory stick, and a docking station, along with a cellular telephone. They obtained a warrant to search those items.

Agents were told — agents from the United States were told by Canadian officers that the laptop that had been seized from Mr. Beckham on March 6 in Canada contained hundreds of images of child pornography. So, they ultimately, here, got a copy of the laptop computer that had been found in the hotel room and examined it and found that it was the laptop that had been brought by the defendant, with him, from his home in The Woodlands, Texas, to Houston [sic] and that it had several hundred images of child pornography, including known identified victims in the National Victim Database as well as the 14 year old boy. His pictures were also on the computer.

Some of those images that were on this computer that were not of the known 14 year old boy in Canada were – showed adults penetrating prepubescent minors.

Agents also obtained records that show that Mr. Beckham had booked his airline flight from The Woodlands to Ottawa after he had had Internet connections with the 14 year old boy, from his home computer in The Woodlands, via the Internet.

They established that the pornography was on the computer before it was transported in interstate or foreign commerce, because they were able to look at the "File Created" dates and determine that those preceded the initiation of Mr. Beckham's travel.

They also did a search warrant at the home in The Woodlands and found a – on March 11th of 2005 and found a box for that same Apple laptop computer, among other things. They also found three computer hard drives at that residence, that had over 950 images on two of the hard drives, that were— that constitute child pornography.

9

The vast majority of those images were found in the unallocated space of the computer. It is important to know there were three known identified victims, though, that were found in the allocated space of the computer, which is the saved portion of the computer, for lack of a more technical explanation.

The images came from Internet web sites. Some of them actually had the WWW name. There were also – there was also information from the agents that the hard drives were manufactured outside the State of Texas.

Some of those same pictures that were found in the unallocated space of the home computers were also found on the laptop computer that he had taken with him to Canada.

There was evidence of the chats between Mr. Beckham and the minor in Canada as early as February of 2005.

The minors depicted in the child pornography that was transported and possessed by the defendant are actual persons under the age of 18 and had traveled in interstate and foreign commerce.

The Court: Okay. Mr. Beckham, tell me in your own words – you don't have to go into detail, but tell me in your own words what it is you did to commit the crime you are pleading guilty to this afternoon.

The Defendant: Yes, your Honor. Like he's advised me, it essentially is the elements that have been dictated in the plea, that I knowingly transported files on my laptop from Houston to Ottawa and some of those files were child pornography. (Transcript of July 7, 2009, Rearraignment, Document No. 105, pp. 4-7, 9-11, 13, 16-22)

Prior to sentencing, a pre-sentence investigation report ("PSR") was prepared to which

Beckham filed written objections and he also filed a Sentencing Memorandum.[2] (Document Nos. 64,

_____

[2] Beckham objected to several sections of the PSR. First, Beckham objected to the PSR's use of the word "victim" because the age of consent under Canadian law is 14 years of age. In addition, Beckham objected to references in the PSR to the volume of child pornography possessed given that when the battery was removed from his computer information was corrupted. Beckham wrote:

At the Defendant's August 5, 2005 Hearing in Ottawa, Canada; the Crown's expert witness who analyzed the Defendant's laptop computer stated that when the Ottawa's police detective removed the battery from the subject laptop computer, he inadvertently caused the laptop's internal clock to be "zeroed-out" thereby seriously compromising both the laptop computer and the Crown's ability to accurately and definitively state with accuracy any precise create-date and time of any files when

69, 86).  The docket sheet shows that the Government responded to Beckham's objections to the

PSR. (Document No. 67).

Pursuant to the PSR, Beckham's guideline sentencing range was calculated as follows:  (1)

Because Beckham pleaded guilty to a violation of 18 U.S.C. 2252A(a)(1) and (b)(1), under U.S.S.G.

§ 2G2.2(a)(2), he had a base offense level of 22.  With respect to Beckham's relevant conduct

assessment, the PSR summarizes:

> 20.  In summary, the child pornography found on Beckham's laptop (seized in
> Canada) and the hard drives [ ] found in his home in The Woodlands, totaled
> approximately 1,400 images.  Beckham's possession involved the following:  the
> lascivious display of genitalia; images involving prepubescent male and female
> children engaged in anal and oral sex, and/or vaginal penetration, with each other
> and/or with adults; images of masochistic or sadistic behavior, to include an image of
> a prepubescent female wearing a mask with her hands bound, while an adult male
> holds an inanimate object, which appears to be a dildo, in her mouth.  The youngest
> children depicted in the images are approximately age four.

---

created.  Therefore, any actual references in the PSR are greatly subject to Court
consternation, and in terms of the actual volume of child pornography possessed or
transported, should be seriously considered suspect and unreliable.

Beckham made ten objections to the PSR.  Several objections had no impact on his sentence
calculations.  In contrast, Objection No. 8 which corresponded to PSR ¶ 20, 28, 35, 37 & 39, had
an impact on his sentence.  According to the PSR, 1400 images were attributable to Beckham based
on the images seized from his laptop computer in Canada and found at his residence in Texas.
According to Beckham, his base offense level should not have been increased by four levels as he
should not have been held accountable for any sadomasochistic images as there was no proof that the
images occurred during the commission of the instant offense.  Similarly, Beckham, through
Objection 9, objected to PSR ¶ 21, 29, 35, 37, 39, 43, 44, 46 & 47.  According to Beckham, his
offense level should not have been increased by five levels based on conduct that took place nine
years prior to the instant offense and which had bearing on the instant charges.  Finally, Beckham,
through Objection 10, objected to PSR ¶ 13, 15, 20, 31, 35, 37 & 39, in which Beckham was held
accountable for 600 or more images, and his offense level was increased by five levels based on the
number of images.  According to Beckham, because the number of images could not be established
with "precision, accuracy or fairness" as to when the images were downloaded, he should not be held
accountable for such a large number of images.  In his Memorandum of Mitigation of Punishment,
Beckham argued for a downward departure pursuant to U.S.S.G. § 5K2.13 for diminished capacity
given that he committed a nonviolent offense, had a reduced mental capacity, and his criminal history
indicated no need for incarceration to protect the public.

21.  Beckham has engaged in a pattern or activity involving the sexual abuse or exploitation of a minor, as defined at U.S.S.G. § 2G2.2, comment. (n. 1).  During the instant offense, there were two separate instances of the sexual abuse or sexual exploitation of the minor male, one of which involved sexual relations, and the second separate incident which involved Beckham taking nude photographs of the minor male.  Moreover, the Court, may consider a 1998 incident which did not result in a conviction, but involved Beckham engaging in sexual relations with minors, which is detailed in the criminal history section of this report.

(2) Because the material seized from Beckham's computers contained material involving prepubescent minor(s) under the age of 12, under U.S.S.G. § 2G2.2(b)(2), Beckham's offense level was increased by two levels. (3) Because the offense involved material that portrayed sadistic or masochistic conduct, under U.S.S.G. § 2G2.2(b)(4) his offense level was increased by four levels.

(4) Because Beckham engaged in a pattern of activity involving the sexual abuse or exploitation of a minor pursuant to U.S.S.G. § 2G2.2(b)(5), his offense level was increased by five levels.  (5) Because a computer was used for the possession and receipt of the materials of this offense under U.S.S.G. § 2G2.2(b)(6), Beckham's offense level was increased by two levels.  (6) Because the offense involved 600 or more images, pursuant to U.S.S.G. § 2G2.2(b)(7)(D), his offense level was increased by five levels. (7)  Because Beckham accepted responsibility for his actions and did so in a timely manner, pursuant to U.S.S.G. § 3E1.1(a) and (b), his offense level was reduced by three levels.  (8)  With an adjusted base offense level of 37 and with a criminal history of category I, Beckham had a guideline sentence range of 210 to 262 months.  The statutory maximum authorized for this offense was 240 months.

On November 7, 2007, Beckham was sentenced.  (Document No. 90, Transcript of Sentencing Hearing, Document No. 107).  With respect to Beckham objections to the PSR  and his request for a downward departure based on diminished capacity, Judge Harmon overruled the

objections to the PSR (Transcript of Sentencing Hearing, Document No. 107, pp. 5-18), denied his request for a downward departure based on diminished capacity (Transcript of Sentencing Hearing, Document No. 107, pp. 18-24), and sentenced Beckham to 210 months imprisonment for the following reasons:

> The Court: Well, Mr. Beckham, Sr., was correct that it's very difficult as a judge to sentence anybody, but certainly it's difficult to sentence a young man, especially a young man who has familial support and love that spills out, and it was very, very moving.
>
> And the parents —I just — it breaks my heart that their son is in this situation, in some part because I know I could tell that they felt that they were somehow responsible for him and his situation.  And I want to say that, as a mother myself, I don't think that parents can be blamed for the situations their children get in, certainly not when their children are adults.  Certainly things we do as parents may be wrong and may be harmful to our children psychologically, but in the end, when the child grows up and takes whatever road the child takes, it's really — The parents have had to let the child go and the child has to accept responsibility and the parents can just simply say, "I love you.  I love you.  I want to help you," but not feel guilty because a child is in a situation that Mr. Dale Eric Beckham finds himself.
>
> And, as Ms. Minnis said, I have had many, many, many sexual predator, possession of pornography cases during my career, and it is true that there are two themes.  One is "I was just chatting on a chat room and I wasn't doing any harm"and the other is "It was a pop-up."  People don't just respond to pop-ups for child pornography.  I mean, it's just impossible.  No person who is not interested in sexual encounters with a minor would go the next step, which would be to click on it.  I mean, it's hard for me to believe.
>
> So, I can't really believe that any – that even though he had many, many, many adult pornographic images on his computer that, when the child pornography came up, that they stayed there because he just neglected to keep them off or that he was so jaded by the viewing of adult pornography that he just didn't even recognize child pornography when he saw it.  I just cannot believe that.
>
> And I think Mr. Beckham is trying to be as honest as he can.  I truly believe that.  But I think he's just deceived himself, which is one of the problems with this kind of illness.  And it is an illness.  There is no question that it's an illness.  There's no question that my heart goes out to Mr. Beckham, because I know that it's very difficult to live with this kind of interest and that has been fostered by being alone and

13

being in one's room and being in front of a screen and getting pleasure from something that is so easy to get and, so, one just becomes more and more into it, and it's with full self-loathing and guilt and all the emotions.

I am sure, Mr. Beckham that you are miserable about this. I can understand that. I mean, I completely understand that. But, you know, I am not a therapist. I am not a psychologist or psychiatrist. My job is not to solve those problems. I mean, your job is to solve those problems and with the help that one hopes you will get. My job is to follow the law.

And I really commend your cousin, the Minister, because I think he is doing something fabulous for you, and that is just sitting down and talking to you and trying to help you understand how it is you went down the wrong path. And, you know, our society is saturated with pornography– soft porn, hard porn. It's sex, sex, sex all over the place. It's very difficult to avoid it. And certainly on the Internet it's every place and it's hard to not have that as a mind set. And I think the Minister has been doing from what he said, he is simply trying to help you understand that that is something you have got to get out of the habit of. And, from what you have said, you have taken that in, but there's a lot more work that needs to be done.

The encounter with the boy in Canada I think is just – when I look at that and then I listen to your parents and I listen to you and I listen to the Minister and I listen to Mr. Rozan, who is eloquent, you know, beyond belief, very eloquent — and I know it's from his heart – but when I look at all of that and I just consider this episode with the boy in Canada, there's a disconnect here. I mean, there's a big, big, big disconnect. And I'm not saying you're lying. I'm not saying you're trying to deceive me. I don't think you are. But you have got the idea that — it wasn't okay. You knew it wasn't okay, but it just – it was kind of okay for you. It wasn't okay, you felt guilty about it. You knew your parents wouldn't approve. You knew that the Minister wouldn't approve. But, you know, that was something that gave you pleasure and, so, you – you know, that's what you did. And, you know, God knows we all sin, we all are sinners, but this was something really, really bad, and I don't think you really – in your desire to make your life right, I think you are, in your own mind, minimizing what this was to those of us who look at it in an objective way. So, anyway...

I know you're depressed. I know you have got some obsessive/compulsive problems. I know that you may be a sex addict, although I don't what a sex addict is, but, to me, an addict is somebody who has got a chemical dependency. I don't really think of people as sex addicts, but somebody who has gotten so into the whole sex thing that they're not really – that that's the only thing that kind of gives them pleasure. It fills that gaping hole in their heart, like some people believe, not others, and all that.

But you have got lots and lots and lots of problems and my heart goes out to you. I know you have got to solve a lot of problems. But my job — as I said before, my job is to be the judge and I have got to decide what the proper sentence is for you. And, as I said before, I do not believe that under the Guidelines a diminished capacity is available for you because of the kind of crime it is.

And then it comes to whether I should sentence you to a non-guideline sentence. I, of course, looked at the Guidelines and looked at 18, United States Code, Section 3553(a), which sets out a bunch of factors, but I think the facts that 18, United States Code, Section 3553(a) set out that are most important in this case are the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment and to protect the public from further crimes from the Defendant, Mr. Beckham.

So, I have considered the Guidelines, I have considered 3553(a) and I find that a sentence within the Guidelines will satisfy the factors of 18, United States Code, Section 3553(a). So, pursuant to the Sentencing Reform Act of 1984, it's the judgment of the Court that the Defendant, Dale Eric Beckham, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 210 months. (Transcript of Sentencing Hearing, Document No. 107, pp. 45-50.

Beckham was sentenced to a term of imprisonment of 210 months, to be followed by a life term of supervised release. Beckham was also ordered to pay a special assessment of $100.00. (Document No. 90, Transcript of Sentencing Hearing, Document No.107, pp. 45-55). Judgment was entered on November 15, 2007. (Document No. 94).

The docket sheet reveals that Beckham filed a § 2255 motion (Document No. 97) on November 6, 2008. In his § 2255 motion, Beckham challenges the voluntariness of his guilty plea based on counsel's representations that he could appeal his original sentence despite language to the contrary on the written plea agreement and he further claims that his attorney told him that any sentence over five or seven years "would be an abuse of discretion and they could appeal that sentence." (Document No. 97, p. 8). Beckham, through grounds two and three, alleges that he received ineffective assistance of counsel when his attorney failed to properly advise him regarding the consequences of his guilty plea. According to Beckham, his counsel failed to conduct a proper

15

investigation.  For example, Beckham states that counsel could have and should retained the services

of an expert to conduct a forensic examination of the evidence seized from Beckham's computer hard

drives.  Beckham writes:  "there was no strategy in advising a client to plead guilty and having

absolutely no idea what the computers establish or do not establish."  (Document No. 97, p. 19).  In

support of his § 2255 motion, Beckham submitted his sworn affidavit in which he states in part:

> On July 7, 2006, I pled guilty to a violation of 18 U.S.C. 2252A(a)(1) and (b)(1),
> pursuant to a plea agreement my attorney at the time, Mr. Steven Rozan, worked out
> for me.  On November 7, 2007, Judge Harmon sentenced me to 210 months
> imprisonment.
>
> At the time Mr. Rozan spoke with me about pleading guilty, I was under the
> impression that the case as going to be dismissed or the evidence suppressed.  His
> exact words were that we were going to "beat this."  When he came to me the next
> day, at the last minute, and spoke about a guilty plea, I was surprised and scared.  He
> told me that I would not sentenced to any more than five or seven years, and that
> if I was, the judge would have "abused her discretion" and we would appeal it or do
> a writ of habeas corpus.
>
> When I was signing the plea agreement, Mr. Rozan told me not to be concerned about
> the waivers because if the court "abused her discretion" (and those were his words),
> then we were going to appeal.  He told me not to worry and that this was for the best.
> He said the language was standard and not to be concerned with it.  I had no idea at
> the time that this waiver actually meant I could not appeal.  In an email from his office
> sent on August 27, 2007, his assistant told my parents that we had to get the best we
> could at sentencing and "fight for more on Appeal or Writ."  (See attachment 1).
>
> I was upset because I had been telling him to hire an expert and he never did.  If I
> recall correctly, even the prosecutor commented at a hearing that he should have hired
> an expert.  The way the number of images and other computer related "facts" kept
> changing— I know an expert could have helped my case.  I thought about
> withdrawing my plea, but Steve's assistant told my parents that Mr. Rozan would
> have a strategy at sentencing.  (See attachment 2).
>
> And on January 16, 2008, after I had been sentenced, he wrote to my parents stating
> that he would be crafting a "postponed Writ of Habeas Corpus."  (See attachment 3),
> He said we had a "realistic shot" of reopening my case from a sentencing perspective.
> This is what I expected all along after my plea.

I never would have pled guilty had he not told me we could appeal if the sentence were above five or seven years. I trusted Mr. Rozan's interpretation of the plea agreement and I would not have done it without those assurances. I counted on Mr. Rozan to do an appeal or do a writ or a motion for reconsideration. He also told my parents this. My parents did not even hire me a writ layer until the last couple weeks because all along we believed Mr. Rozan was working on it. Finally, when he kept refusing calls and letters, I realized I needed to go forth with this myself.

His promise that we could appeal of my sentence was over five to seven years is why I pled guilty. (Document No. 97, Appendix 4, pp. 30-32).

In addition, Beckham attached to his § 2255 motion correspondence such a emails that had been exchanged between Craig, an assistant to Mr. Rozan, and Beckham's parents on or about August 27, 2007, and a letter written by Mr. Rozan to Beckham's parents dated January 16, 2008. The messages exchanged between Mr. Rozan's assistant Craig and Beckham's father state:

Steve, Hope the wedding was wonderful. When are you going to see Dale?
Delbert

In response:

Steve is coming back on Wednesday. He is leaving for VA on Thursday. If Dale is serious about trying to withdraw his plea of guilty which Steven has gone over repeatedly and explained the downfalls of same to him, he can call our office and let me know. I will draft-up the Motion. It probably will **not** be granted by his judge and will assure him of not receiving any credit for Acceptance of Responsibility. Of course, his prosecutor might not oppose the Motion because she would love to file a Superceding Indictment with the 30-year charge included and let him go to trial.

Delbert, I know that this is very difficult for you and your wife, but we have to get the best we can at Sentencing and fight for more on Appeal or Writ.

I will tell Steve to call you when he returns ASAP.

Craig.

Beckham's father responded:

Craig,

I do not appreciate the tone of your message. Perhaps I am taking it wrong. I only remember one visit in which Steve and Dale spent some of the time discussing the plea, the others have involved the doctors. In all there have been only a few in the last year! I would remind you that he was moved to Montgomery County last December, and the delays multiplied.

Steve has repeatedly told us he was going to see Dale, but has not for many different reasons.

**You do not need to draft any motions for him.**

Steven and I have discussed this on several occasions and I was simply wanting to know when he was going, since we are within 4 or 5 weeks again.

I trust you will print a copy of this and give it to Steve. Both of your comments and mine!

Delbert


The exchange concluded with this email from Craig, Mr. Rozan's assistant:

Strictly business Delbert. Please don't take anything personal. If you prefer that I do not respond to your e-mails and try to keep you informed, please let me know. I do not sugar coat anything. I only know that I have been doing this job for over 10-years and have seen a lot of cases. I know what a brutal system we are dealing with. I know how mean-spirited Martha Minnis is. You are one of my favorite people of the clients we now have. However, Steve has told me that he and Dale have discussed the withdrawal of Dale's plea of guilty beginning when he was still at FDC. I wasn't there, so I have to take Steve at his word. Every time, Steve has strenuously urged Dale not to withdraw his plea and has given his reasons for the same. Dale keeps coming back to Steve with the same questions.

I do know that Steve **did** take some calls from Dale not long ago. I realize that not all of Dale's calls have been taken recently, but only because Steve was not in the office. He will slow down again next week and have sufficient time to visit and explain again his strategy at Sentencing.

I will definitely print all of this email for Steve I certainly did not like your tone on that one. I think that it is honest and to the point.

18

Craig

With respect to the letter sent by Mr. Rozan to Beckhams' parents following his sentencing in January

2008, Mr. Rozan wrote:

> Bobbi and I sat down several times over the Holidays to write you a very special
> Christmas Card, which we never seemed to complete.  I can only imagine how
> difficult it was for this particular Christmas Season to pass now knowing what the end
> result was, to date, from, from Judge Harmon.  I am borrowing a line from a scripture
> that says that "hope is a good thing ... possibly the best of all things ... and no good
> thing ever dies."  I still firmly believe that with the looming aspect of my Oral
> Argument before the Fifth Circuit on January 28, 2008; that I will be able to reference
> by name and case number, Dale's case and directly point out to the Fifth Circuit that
> there is already a conflict of decisions within the Southern District of Texas relative
> to Chapter 110 of Title 18 (referencing Diminished Capacity].  As earlier related in-
> depth to you, Judge Lynn Hughes, in this very same District, chose to completely
> ignore and negate the government's argument on that same point.  The follow-up
> argument that I hope to craft on a postponed Writ of Habeas Corpus before Judge
> Harmon on Dale's behalf, is that under two very recent U.S. Supreme Court decisions
> dated December 10, 2007 [after Dale's Sentencing] entitled *U.S. v. Gall* and *U.S. v.
> Kimbrough*; we have a realistic shot of reopening Dale's case from a Sentencing
> perspective.  I won't try, within the confines of this letter to delineate a bunch of
> legalease, but will simply state that those cases provide an opportunity to circumvent
> the wavier of appeal, given the special impetus of the proposition they stand for.

>            *                     *

> I will keep you informed of my take on the Fifth Circuit proceedings immediately on
> my return from New Orleans, bearing in mind that they will not render an Opinion for
> perhaps another 30-45 days.  It will be on that basis that I file additional pleadings for
> Dale.  (Document No. 97) (Emphasis in original)

The Government has answered and has moved to dismiss the instant action on the ground that

Beckham, as part of his written Plea Agreement, waived the right to bring a motion under    § 2255,

and that his written Plea Agreement should be enforced.  (Document No.109).  The Government

further argues that even assuming that Beckham had not waived his right to pursue relief under §

2255, he nevertheless is not entitled relief because the gist of Beckham's contentions relate to his

counsel's actions with respect to the length of his sentence and are barred by the waiver.  The Government further argues that his claims, in any event, are without merit, because Beckham's plea was knowing and voluntary, and there was no breach of the agreement by the Government.  The Government further argues that Beckham's ineffective assistance of counsel claims are without merit as the record clearly shows that Beckham's counsel had reviewed the computer images (Transcript of Sentencing Hearing, Document No. 107, p. 17), negotiated a favorable plea agreement with the government, which included the Government not filing additional charges, and not opposing a three level adjustment to his sentencing calculation for acceptance of responsibility (Document No. 49, ¶ 10, Transcript of Rearraignment, Document No. 105, p. 6), filed written objections to the PSR, and filed a Sentencing Memorandum based on diminished capacity.  (Document Nos. 64, 69, 80).  To the extent that Beckham relies on correspondence exchanged by counsel and his legal assistant, all of the correspondence in question was exchanged *after* Beckham's Rearraignment.

In response to Beckham's ineffectiveness of counsel claims, the Government has attached an affidavit of Mr. Rozan regarding his handling of this case.  Mr. Rozan states in pertinent part:

> I have carefully reviewed Mr. Beckham's § 2255 Motion which erroneously claims that I provided ineffective assistance of counsel.  Contrary to the claims made in his § 2255 Motion; I spent considerable time with Mr. Beckham and his parents on several occasions explaining the consequences of Mr. Beckham pleading guilty as well as going to trial.  I throughly explained the advisory Federal Sentencing Guidelines to him and their application.  This was very important because I believed that there was the possibility that Judge Harmon in his case would potentially apply the advisory Guidelines.  Mr. Beckham was aware of a somewhat parallel case in U.S. District Judge Lynn Hughes' Court in Houston in which exceedingly favorable Sentencing results were obtained by me in the face of the same AUSA, Martha Minnis, involving the same charge of possession of child pornography, which may have had some influence in his decisional process to plead guilty.  Further, that the government had informed me that if Mr. Beckham did not plead guilty, a Superseding Indictment would assuredly be filed and charge Mr. Beckham with other offenses which could impose a Sentence of thirty (30) years imprisonment or more.  In the final analysis,

20

and after giving Mr. Beckham the best information and advice about his case and thoroughly advising him of the consequences of same from my 38-years of experience as a lawyer in Federal Court, Mr. Beckham **himself** ultimately made the decision to plead guilty.  I unequivocally state that I **never** promised or guaranteed Mr. Beckham that he would receive a sentence of 5 to 7 years imprisonment.  I also recall at the Rearraignment that Judge Harmon addressed Beckham personally on-the-record and inquired if he was entering his plea as the result of any promise that was not in the Plea Agreement.  He stated under oath that there was no such promises.  There was **never** such "an actual promise" as averred in Beckham's § 2255 Motion, nor was there ever any intent on my part to insinuate or guarantee that kind of result from the Court.  In fact, the record at Rearraignment on July 7, 2006 is abundantly clear that Judge Harmon admonished Beckham that any educated guess regarding his sentence by either the defense or the government was not and cannot be binding on the Court and that even the Court did not know then and would not know until after the Presentence Report had been published, objections filed, argued and considered by the Court at Sentencing, as to what the ultimate Sentence would be.  Mr. Beckham's plea of guilty was not involuntary in this regard because he **was** informed by the Court that he [had] no right to appeal pursuant to the Plea Agreement.  I was also very concerned, subsequent to Mr. Beckham's plea of guilty, and prior to Sentencing, that Mr. Beckham expressed a desire to withdraw his plea of guilty.  I personally visited with him and explained in no uncertain terms that if he did so, the government would ask, and the Court would most probably agree, that he would not be able to withdraw his plea of guilty and that he would be deprived of the three (3) offense level reduction for timely Acceptance of Responsibility.  With respect to my earlier feelings and hopes as to the proposition of "reasonableness" under the U.S. Supreme Court decisions in *Gall* and *Kimbrough*; please remember that any earlier references I had to those cases as relates to a potential ability of Beckham to appeal an unreasonable Sentence disproportionate to considerations under 18 U.S.C. §3553(a), were made at a time when those two cases were **pending** and not decided by the U.S. Supreme Court.  In my January 16, 2008 letter to Mr. and Mrs. Delbert Beckham, which was shortly **after** Beckham's Sentencing on November 7, 2007, I was still believing and hopeful that somehow I could file a Motion for Reconsideration of Sentencing by the Court.  This would **not** be as either a Direct Appeal or a Writ, and hence by use of the word "*circumvent*" the waiver of appeal, I was considering some creative argument based on the afterthought consideration of the lengthy medical testimony proffered at Sentencing.  Please note that I unilaterally paid  for **all** of Dr. Bruce Kahn's evaluation, interview, travel and testimonial time in Court.  I felt that strongly about Beckham's cause that I paid for these expenses out of my own pocket and never sought a reimbursement from Beckham's parents.  My later letter dated October 7, 2008 to Mr. Dale Beckham wherein I stated that said Motion for Reconsideration would be "*fruitless and futile*" was based on a continued monitoring of Fifth Circuit cases pursuant to that Court's interpretation of *Gall* and *Kimbrough*.  I unhesitating state that Dale Beckham was indeed **properly** advised of the consequences of his plea

21

even after due consideration of my personal thoughts to Mr. Beckham regarding the two U.S. Supreme Court cases.  I was asked by the Court on-the-record if there were any meritorious defenses, as well as Mr. Beckham's understanding of the Plea Agreement, its consequences and if he was satisfied with my representation as his defense counsel.  With regard to the number of images located on Mr. Beckham's computer; I had earlier personally gone to the evidence room at the U.S. Attorney's Office and in the presence of AUSA Martha Minnis and her two Federal Investigator/Agents, viewed the subject child pornography images and accepted their inventory print-out of same as being numerically correct.  I had no reason then or now to believe that they were lying about this number, although AUSA Minnis did indeed state a different numerical count a few different times to the Court at Sentencing which bred some confusion and question, but my recollection is that that number was **not** less than the 600 image cut-off number in the Guidelines.  In fact, based on what the government had tendered to me by way images and inventory, it was clear that the numerical count was well over the 600 image reference in U.S.S.G. § 2G2.2(7)(D).  I believed that my inquiry into this area was more than just a "general duty."  My most fervent strategy in Mr. Beckham's plea of guilty before the Court involved being able to firmly establish, through the Expert testimony of two (2) psychiatrists and one (1) psychologist, that Mr. Beckham's character, mental characteristics, history of interaction with relatives, his job category, personal life-style, and most importantly, the **fact** that he was **not** a danger to either the public **or** to himself, that he was not a pedophile, that he was therefore well-deserving on a non-Guideline low-end statutory Sentence of sixty (60) months.  I genuinely put my heart, soul, office resources, personal money and best professional efforts into posturing Mr. Beckham's case in this regard and was extremely upset that the Court meted-out such a harsh Sentence.  (Document No. 109) (emphasis in original).

This § 2255 proceeding is ripe for ruling

## II. Discussion

### A.  Wavier

A defendant's waiver of his statutory right to collaterally challenge his conviction with a motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255, like a waiver by a defendant of his right to appeal, is generally enforceable if the waiver is both knowing and voluntary.  *United*

*States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994) (Enforcing defendant's voluntary and knowing waiver of § 2255); *United States v. McKinney,* 406 F.3d 744, 746-47 & n.5 (5th Cir. 2005) (Enforcing, post-*Booker,* a waiver of appeal right that was signed prior to the issuance of *Booker).* Such waivers, however, do not "preclude review of a sentence that exceeds the statutory maximum." *United States v. Hollins*, 97 Fed. Appx. 477, 479 (5th Cir. 2004). In the context of a plea agreement waiver, a sentence exceeds the statutory maximum only when it exceeds the maximum allowed by statute. *United States v. Bond*, 414 F.3d 542, 546 (5th Cir. 2005); *United States v. Cortez*, 413 F.3d 502, 503 (5th Cir.), *cert. denied*, 126 S.Ct. 502 (2005). In addition, when a defendant alleges that his counsel was ineffective in negotiating a plea agreement, such ineffectiveness claims are not barred by the waiver. *See United States v. White,* 307 F.3d 336, 343 (5th Cir. 2002) ("[i]neffective assistance of counsel argument survives a waiver of appeal only when the claimed assistance directly affected the validity of that waiver or the plea itself."); *United States v. Cockerham,* 237 F.3d 1179, 1187 (10th Cir. 2001) ("[W]e hold that a plea agreement waiver of postconviction rights does not waive the right to bring a § 2255 petition based on ineffective assistance of counsel claims challenging the validity of the plea or the waiver.  Collateral attacks based on ineffective assistance of counsel claims that are characterized as falling outside that category are waivable."), *cert. denied*, 534 U.S. 1085 (2002); *DeRoo v. United States*, 223 F.3d 919, 924 (8th Cir. 2000) ("A defendant's plea agreement waiver of the right to seek section 2255 post-conviction relief does not waive defendant's right to argue, pursuant to that section, that the decision to enter into the plea was not knowing and voluntary because it was the result of ineffective assistance of counsel."); *Mason v. United States,* 211 F.3d 1065, 1069 (7th Cir. 2000) (where the ineffectiveness claims raised in a  § 2255 motion relate to counsel's performance at sentencing, the defendant's plea agreement waiver of this right to

challenge his conviction in a § 2255 proceeding is enforceable), *cert. denied*, 531 U.S. 1175 (2001).[3]
Ineffective assistance of counsel claims, including challenges to counsel's performance at sentencing,
which do not relate to the validity of the Plea Agreement and waiver, can be waived. *White,* 307 F.3d
at 343.  Otherwise, "[i]f all ineffective assistance of counsel claims were immune from waiver, any
complaint about the process could be brought in a collateral attack by merely challenging the
attorney's failure to achieve the desired result.  A knowing and intelligent waiver should not be so
easily evaded." *White,* 307 F.3d at 344.

  Here, pursuant to a written Plea Agreement, Beckham waived his right to appeal and waived
his right to collaterally attack his plea, conviction and sentence.  As discussed above, the written Plea
Agreement was explicit with respect to the waiver of the right to appeal *and* to pursue collateral
relief. (Document No. 49, ¶ 7-9).

  In addition, at his Rearraignment on July 7, 2006, the Court engaged in an extended colloquy
to ensure that Beckham was competent to participate in the Rearraignment proceedings, had read the
written Plea Agreement, discussed the contents of the written Plea Agreement with counsel and
understood the agreement, that no promises had been made to induce his plea, that he understood the
offense to which he was pleading guilty, the maximum sentence he faced on Count 1, namely a

---

  [3] There are some other limited situations in which a plea agreement waiver of the right to seek
collateral review under § 2255 is not enforceable, such as where the sentence imposed violates the
terms of the plea agreement, the sentence is illegal, or the Government has suppressed exculpatory
evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). *See DeRoo,* 223 F.3d at 923
("defendants cannot waive their right to appeal an illegal sentence or a sentence imposed in violation
of the terms of an agreement"); *United States v. Baramdyka,* 95 F.3d 840, 843 (9th Cir. 1996) ("the
waiver of a right to appeal may be subject to certain exceptions such as claims involving a breach of
the plea agreement, racial disparity in sentencing among codefendants or an illegal sentence imposed
in excess of a maximum statutory penalty"), *cert. denied,* 520 U.S. 1132 (1997); *United States v.
Hollins,* 97 Fed. Appx. 477, 479 (5th Cir. 2004) (Waiver does not preclude review of a sentence that
exceeds the statutory maximum).  None of those circumstances is at issue in this proceeding.

mandatory minimum term of imprisonment of five years and up to 20 years, the rights he was giving up by virtue of his guilty plea, and the factual basis of the charges and his guilty plea. The Court also advised Beckham about the waiver provisions.   Based on Beckham's responses during the lengthy colloquy, Judge Harmon concluded that Beckham's guilty plea and waiver of his right to appeal and collaterally attack his conviction and/or sentence was knowing and voluntary.

Given Beckham's statements on the record, which carry a strong presumption of verity, *Blackledge v. Allison,* 431 U.S. 63, 74 (1977), that he had read and discussed the written Plea Agreement with his counsel, that he understood the statutory and constitutional rights which he was waiving, that he understood his possible range of punishment and how his sentence would be computed, and that he understood that he had waived his right to appeal and to file a post conviction proceeding, as well as Judge Harmon's determination that Beckham's plea was knowing and voluntary,  Beckham has not shown that his plea was not counseled, knowing and voluntary, and upon this record, Beckham's plea agreement waiver of his right to collaterally attack his conviction with a § 2255 motion is enforceable.  Moreover, Beckham's  ineffective assistance of counsel claims relate to counsel's performance after his Rearraignment, and not to the validity of the Plea Agreement and waiver, and are therefore covered by the waiver.

Because Beckham's plea agreement, and waiver of collateral rights contained therein, were knowingly, voluntarily, and intelligently entered, because Beckham has waived his right to bring a § 2255 motion, and because that waiver is valid and should be enforced, it serves as a bar to the instant § 2255 motion.  Upon this record, the Government is entitled to enforce Beckham's waiver and this § 2255 proceeding is subject to dismissal.

**B.  Merits**

Even if Beckham's waiver was not enforceable, the record supports the conclusion that no relief is available to Beckham on the merits of his ineffective assistance of counsel claims. Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id.* at 687-88. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable.  *Id.* at 694-95.  Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief.  The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy."  *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*).  To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)). The court's role "under § 2255 is not to audit decisions that are within the bounds of professional prudence." *United States v. Molina-Uribe*, 429 F.3d. 514, 518 (5th Cir. 2005), *cert. denied*, (2006). In addition, conclusory allegations or "generalized assertions" of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *United States v.* Demik, 489 F.3d 644, 646-47 (5th Cir. ), *cert. denied*, 128 S.Ct. 456 (2007), *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

With respect to guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Thus, Beckham "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* The specific examples of counsel's ineffective assistance, which Beckham cites to in support of ineffectiveness claims, namely that he was told that he could file an appeal or writ should his sentence

exceed five or seven years, that his attorney failed to advise him about the consequences of plea, and failed to investigate, are not supported by the record.  The record clearly shows that counsel advised Beckham about his guilty plea and consequences thereof, and that no promises were made to induce his plea such as a specific sentence of 5 to 7 years, as evidenced by the addendum to the written Plea Agreement and the transcript of his Rearraignment.  A review of the written plea agreement shows that Beckham signed and acknowledged that he had read the written plea agreement, understood it, and had discussed the contents with counsel.  Second, Beckham was advised of the same at his Rearraignment.  Moreover, the record shows that not only does the written plea agreement expressly state that no sentence could be predicted prior to sentencing but Beckham was advised of this at his Rearraignment and unequivocally stated he understand this.   To the extent that Beckham argues that he was misled regarding the length of sentence, i.e, he believed it would be much shorter, the law is clear that "[a] miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance rising to the level of ineffective assistance of counsel. Moreover, even assuming that counsel had advised Beckham that his sentence would be shorter, the Court advised him that his sentence could not predicted at the time he entered his plea. (Transcript of Rearraignment, Document No. 105, p. 11).

        In addition, to the extent that Beckham contends counsel failed to investigate his offense, the record shows that counsel objected to the PSR concerning the computer images, and that he had indeed reviewed the images in question.  Moreover, counsel hired mental health care professionals to testify at the sentencing hearing in an attempt to shorten Beckham's sentence.  Beckham's ineffectiveness allegations are controverted by the record and without merit.  The record affirmatively

shows that Beckham's counsel was not deficient and there is no evidence that any alleged error prejudiced Beckham within the meaning of *Strickland.*

In conclusion, Beckham has offered no proof as to how counsel's performance was objectively deficient, and no proof that such deficient performance prejudiced him in any way. *See Strickland,* 466 U.S. at 687. Therefore, no relief is available under § 2255 on the ineffective assistance of counsel claims.

## IV.  Conclusion and Recommendation

Based on the foregoing, and the conclusion that Beckham's guilty plea was knowing and voluntary and that his waiver of his right to collaterally attack his conviction should be enforced, and further that no relief is available to Beckham on the merit of his claims, it is

RECOMMENDED that the Government's Motion to Dismiss (Document No.109) be GRANTED, that Movant Beckham's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 97) be DENIED, and that this § 2255 proceeding be DISMISSED with prejudice.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).

Signed at Houston, Texas, this 24th  day of August, 2009.


Frances H. Stacy
United States Magistrate Judge